IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JOE G. HOLLINGSWORTH, et al.,          :

   Plaintiffs/Counter-Defendants,:

v.                                     :

CHATEAU BU-DE, LLC,                    :

   Defendant/Counter-Plaintiff.  :

                                       : Civil Action No. GLR-12-3673

CHATEAU BU-DE, LLC,                    :

   Third-Party Plaintiff,        :

v.                                     :

THOMAS MITCHELL, et al.,               :

   Third-Party Defendants.       :

**<u>MEMORANDUM OPINION</u>**

This declaratory judgment action is before the Court on cross-motions for summary judgment seeking an interpretation of restrictive covenants established over forty years ago. The salient issue is whether Defendant/Counter-Plaintiff Chateau Bu-De, LLC's ("CBD") planned operation of a vineyard and winery violates the restrictive covenants, which explicitly prohibit commercial activity on the property. The Court, having reviewed the pleadings and supporting documents, finds no hearing necessary. <u>See</u> Local Rule 105.6 (D.Md. 2011). For the reasons outlined below, the Court will grant Plaintiffs', Joe G.

Hollingsworth and Nancy E. Hollingsworth, as well as Third-Party Defendant Margaret Daly's (collectively, "Plaintiffs"), Motion for Summary Judgment (ECF No. 55) and deny CBD's Motion for Summary Judgment (ECF No. 54) because the plain and unambiguous language of the restrictive covenants, as well as the Road Maintenance Agreement, prohibit CBD's planned activities.

## I.   BACKGROUND[1]

Plaintiffs Joe G. Hollingsworth and Nancy E. Hollingsworth (the "Hollingsworths"), Third-Party Defendant Margaret Mary Daly, and Defendant/Counter-Plaintiff CBD are owners of adjacent parcels of land located in Talbot County, Maryland.

On June 26, 1967, Roy G. Brooks and Anne C. Brooks conveyed the parcels by deed to S. Stockton White, IV, as an approximately 477 ¼ acre single tract of land known as Ingleside Farm.  In 1972, Mr. White subdivided sections of Ingleside Farm into four parcels, labeled "A" through "D," and thereafter sold a portion of the property, believed to be Parcel C, to Frederick R. Menke.

On August 2, 1972, Mr. White conveyed Parcels A and B, by way of separate deeds, to Trustees Joseph A. Alexander, Jr., John W. Jackson, and H. Donald Kistler ("Alexander Deed") and Norton A. Higgins and Betty K. Higgins ("Higgins Deed")

---

[1] Unless otherwise noted, the following facts are undisputed and are viewed in the light most favorable to the nonmoving party.

respectively. The Alexander and Higgins Deeds subjected Parcels A and B to several restrictions, which provide, in relevant part:

> (b) No more than one dwelling or residence shall be erected on any one lot or parcel in any such development, or any said amendment of a Plat of "Ingleside", said dwelling or residence being restricted to a single family dwelling or residence; this restriction, however, is not to be construed as preventing the erection of a separate guest house for nonrentable use in connection with the main dwelling, if such separate guest house is constructed no more than two (2) years prior to the completion of the single family residence required herein.

> (c) The land areas contained in said Parcels A and B shall be for residential use only and not for purposes of any trade or business whatsoever.

> . . . .

> (h) No building or other structure shall be commenced, erected or maintained, nor shall any substantial addition to or architectural change or alteration therein be made, until the plans and specifications, showing the nature, kind, shape, height, materials and location of such structure have been submitted to and approved in writing by Frederick R. Menke, his successor or successors in interest, his nominee or nominees. . . .

> . . . .

> (k) All of the aforegoing conditions and restrictions, being made a part of the consideration for this conveyance, shall be covenants running with the land and shall be binding upon the grantees, their heirs and assigns; and any sale, conveyance, lease or

> mortgage made in violation of the terms hereof
> shall be null and void . . . .

(CBD's Mot. Summ. J. Exs. 3-4, ECF Nos. 54-4, 54-5; Pls.' Mot. Summ. J. Exs. F-G, ECF Nos. 55-8, 55-9). The same day, Mr. Menke subjected his property, Parcel C, to the same restrictions by deed. (See CBD's Mot. Summ. J. Ex. 5, ECF No. 54-6; Pls.' Mot. Summ. J. Ex. H, ECF No. 55-10). Each of the deeds were duly recorded among the Land Records of Talbot County, Maryland.

In December 1981, Hugh C. Daly and Margaret M. Daly, successors in interest to Parcel A, and the Higgins subjected their properties to conservation easements in favor of the Maryland Environmental Trust ("MET Easements").[2] The purpose of the MET Easements is to preserve the scenic, agricultural, and rural nature of the properties, among other things. They provide, in pertinent part:

> 1. This Conservation Easement shall be
> perpetual. It is an easement in gross and
> as such is inheritable and assignable and
> runs with the land as an incorporeal
> interest in the Property, enforceable with
> respect to the Property by the Grantee
> against the Grantor and his personal
> representatives, heirs, successors and
> assigns.

---

[2] The Hollingsworths aver that the MET Easement only applies to approximately four acres of their property due to various plat revisions.

> 2. No industrial or commercial activities,
> with the exception of farming and activities
> that can be conducted from a residential or
> farm building without alteration of the
> external appearance of the building, shall
> be conducted on the Property. Sale of farm
> products by the Grantor to the public shall
> be a permitted use.

(CBD's Mot. Summ. J. Ex. 8, at 5, ECF No. 54-9; id. Ex. 9, at 4,

ECF No. 54-10).

Each parcel is also accessed by a private gravel road

formerly known as Riverside Drive but currently referred to as

Riverside Lane. This access subjects each parcel to a 2004 Road

Maintenance Agreement that provides, in relevant part:

> (a) The property owners agree to maintain
> Riverside Drive in its present condition as
> a crowned, gravel lane, approximately twelve
> (12) foot [sic] in width, with a top
> chipping of crushed stone. . . .
>
> . . . .
>
> 2. **Voting.** Each property owner shall vote
> their individual percentage interest.
> Matters involving routine maintenance shall
> require at least a seventy-five percent
> (75%) vote. Matters involving substantial
> changes to Riverside Drive, such as
> upgrading, widening, or converting [it] from
> a private road to a public road shall
> require unanimous consent. However, any
> owner who wishes to upgrade the surface of
> the road only may do so at their sole cost
> and expense, including assuming the
> additional cost and expense of maintaining
> the roadbed in that condition.

(CBD's Mot. Summ. J. Ex. 19, ECF No. 54-20; Pls.' Mot. Summ. J. Ex. I, ECF No. 55-11).

In May 2004, the Hollingsworths purchased their property subject to the 1972 Alexander Deed restrictions and the 1981 MET Easement. (See CBD's Mot. Summ. J. Ex. 2, ECF No. 54-3). The Hollingsworths built their current residence on the land shortly thereafter.

In December 2011, CBD purchased its property subject to the Higgins Deed restrictions. (See CBD's Mot. Summ. J. Ex. 1, ECF No. 54-2). There is, however, no reference to the 1981 MET Easement in the CBD deed. CBD principal, Warren Dedrick, and his wife, Brenda Dedrick, reside on the CBD property.

CBD purchased its property with the intent to operate a vineyard, winery, and retail store on the premises. The plans included building an on-site processing facility and wine tasting room/sales area for CBD customers as well as upgrading and widening Riverside Lane for public usage. At the time, CBD's website also invited the public to visit the CBD property for day-long outings. To further its goals, CBD hired a wine maker in the summer of 2012 to begin making wine at an off-site location.

On November 7, 2012, the Hollingsworths commenced this declaratory judgment action against CBD in the Circuit Court for Talbot County, Maryland seeking to enjoin CBD from engaging in

the aforementioned activities. (ECF No. 2). CBD filed an Answer and removed the action to this Court on December 13, 2012. (ECF Nos. 5-6). After moving for joinder of additional parties and for leave to file amendments, CBD filed its Amended Answer, Amended Counterclaim, and Third-Party Complaint against Thomas C. Mitchell, Maria M. Mitchell, and Margaret Mary Daly on March 5, 2013. (ECF Nos. 19-25).

Since the Hollingsworths filed this action in 2012, CBD has obtained wine manufacturing and wholesale licenses from the State of Maryland, built a bonded facility in its garage that currently stores over 200 cases of wine (which is approximately over 2,400 bottles), and planted its grapevines.

## II. DISCUSSION

### A. Standard of Review

Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A "material fact" is a fact that might affect the outcome of a party's case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248; <u>Hooven-Lewis v. Caldera</u>, 249 F.3d 259, 265 (4th Cir. 2001).

When the parties have filed cross-motions for summary judgment, the court must "review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." <u>Rossignol v. Voorhaar</u>, 316 F.3d 516, 523 (4th Cir. 2003) (quoting <u>Philip Morris Inc. v. Harshbarger</u>, 122 F.3d 58, 62 n.4 (1st Cir. 1997)) (internal quotation marks omitted). Moreover, "[w]hen considering each individual motion, the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." <u>Id.</u> (quoting <u>Wightman v. Springfield Terminal Ry. Co.</u>, 100 F.3d 228, 230 (1st Cir. 1996)) (internal quotation marks omitted).

**B.   <u>Analysis</u>**

Plaintiffs initiated this action to preclude CBD from operating a vineyard, complete with a winery and retail sales market, on its property. According to Plaintiffs, the deed restrictions applicable to all parcels involved in this action prohibit CBD from engaging in commercial activity on site. Moreover, Plaintiffs aver that the Road Maintenance Agreement prevents CBD from converting Riverside Lane, a private, communal, gravel thoroughfare, into a public road.

Conversely, CBD argues the deed restrictions do not preclude it from engaging in its planned commercial activities because the restrictive covenants are ambiguous, the Hollingsworths have unclean hands, and the restrictions have been abandoned. CBD also argues the Road Maintenance Agreement permits it to upgrade Riverside Lane for public use as long as it furnishes the proceeds for the upgrade. The Court will address each argument seriatim.

### 1. Ambiguity of the Restrictive Covenants

The Court concludes the plain language of the restrictive covenants is clear and unambiguous.

In Maryland, contract interpretation principles govern how to apply and interpret restrictive covenants. See South Kaywood Cmty. Ass'n v. Long, 56 A.3d 365, 371 (Md. 2012) (collecting cases); SDC 214, LLC v. London Towne Prop. Owners Ass'n, Inc., 910 A.2d 1064, 1069 (Md. 2006) (same). Although restrictive covenants "are to be enforced according to the objective intent of the original parties[,]" courts are tasked with "[determining] from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated." Dumbarton Improvement Ass'n, Inc. v. Druid Ridge Cemetery Co., 73 A.3d 224, 233 (Md. 2013) (quoting Calomiris v. Woods, 727 A.2d 358, 363 (Md. 1999)).

The court's restrictive covenants analysis involves three steps. First, in discovering the intent of the covenanting parties, the court must look to the plain language of the restrictive covenant. Id. If the language of the covenant is unambiguous, "a court should simply give effect to the language unless prevented from doing so by public policy or some established principle of law." SDC 214, 910 A.2d at 1069 (quoting Miller v. Bay City Prop. Owners Ass'n, 903 A.2d 938, 948 (Md. 2006)) (internal quotation marks omitted). Once the court concludes the covenant is unambiguous, no further analysis is required. See, e.g., South Kaywood, 56 A.3d at 371 ("[W]here the language of an instrument containing a restrictive covenant is clear with regard to the controversy before the court, there is no occasion to consider extrinsic evidence concerning the intent reflected in the restriction.").

Conversely, if the court concludes the plain language of the covenant is ambiguous,[3] it proceeds to the second step, which is to consider extrinsic evidence illustrating the circumstances surrounding the adoption of the restrictive covenant. South Kaywood, 56 A.3d at 372; SDC 214, 910 A.2d at 1070. Under Maryland law, this process is known as the rule of reasonably strict construction. SDC 214, 910 A.2d at 1069. It is

_____

[3] "[A] covenant is ambiguous if its language is susceptible to multiple interpretations by a reasonable person." Dumbarton, 73 A.3d at 233.

important to note that the court's use of extrinsic evidence is limited to the clarification of the ambiguous language previously identified in the first step. Dumbarton, 73 A.3d at 235. Finally, if the extrinsic evidence does not clarify the pendant ambiguity, the covenant must be construed in favor of unrestricted use. South Kaywood, 56 A.3d at 372; Quinn Homes, Inc. v. Bay City Improvement Ass'n, 413 A.2d 950, 951 (Md. 1980).

In this case, the three properties at issue are each subject to a restrictive covenant that states "[t]he land areas contained in said Parcels A and B shall be for residential use only and not for purposes of any trade or business whatsoever." (CBD's Mot. Summ. J. Ex. 3, at 2). CBD avers that the restrictive covenant is ambiguous because the terms "business"[4] and "trade" are not defined and there is no admissible evidence of the drafter's intent in the record. These arguments are unavailing.

At the outset, the plain language of the restrictive covenant illustrates the drafter's intent to create a residential community as it specifically states that the parcels

---

[4] The Court of Appeals of Maryland has noted that the term "business" is unambiguous. See State Farm Fire & Cas. Co. v. Quirt, 346 A.2d 497, 502 n.9 (Md. 1975) ("The term 'business' is unambiguous. Courts have consistently held that business connotes a pursuit or occupation of a commercial or mercantile nature to obtain a livelihood.").

are to be used "for residential use only." The latter half of the covenant prohibiting the parcels' use "for purposes of any trade or business whatsoever" does not render an otherwise clear residential objective ambiguous. Although the terms "trade" and "business" are not defined, a review of the entire deed amplifies the intent of the drafter to establish a residential community free from commercial activity. See Dumbarton, 73 A.3d at 236 (noting that the rules of contract construction require the court to consider the deed as a whole, not in isolation).[5] Of particular import is paragraph f, which prohibits owners from raising animals on the land unless they are pets or horses/ponies kept for personal use.[6] Moreover, this paragraph specifically prohibits animals being housed on the property for "commercial purposes," which clarifies the prohibition on "any trade or business whatsoever." Pursuant to the clear and unambiguous language of the restrictive covenants, the drafter's intent of creating a rural residential community prohibits owners from engaging in commercial activity on the land.

---

[5] The Court also notes that establishing the drafter's intent is an objective inquiry. The Court's "task, therefore, . . . is not to discern the actual mindset of the parties at the time of the agreement . . . ." Dumbarton, 73 A.3d at 232.

[6] Paragraph f reads: "No animals or fowl of any kind or description shall be raised, kept or maintained thereon, except for accepted household pets; and this restriction shall not prohibit lot owners from keeping and housing on their lot or lots riding horses and/or ponies for their own personal use, but not for commercial purposes." (CBD's Mot. Summ. J. Ex. 3, at 3).

Furthermore, there is no indication that public policy or some established principle of law prevents the Court from giving effect to the plain language of the restrictive covenants.

Plaintiffs, citing Chesapeake Estates Improvement Association v. Foster, 288 A.2d 329 (Md. 1972); Quinn Homes, Incorporated v. Bay City Improvement Association, Incorporated, 413 A.2d 950 (Md.Ct.Spec.App. 1980); and Newell v. Dundalk Corporation, 131 A. 148 (Md. 1925), correctly note that Maryland courts have previously upheld identical deed restrictions.[7] Although the Maryland courts' previous enforcement of similar deed restrictions implies the courts found the restrictions unambiguous, Quinn Homes is the only case Plaintiffs cite that remotely references the question of ambiguity. Quinn Homes, however, merely regurgitates the rule that the presence of ambiguous language in a restrictive covenant compels construction in favor of unrestricted use. See 413 A.2d at 951. In that case, the appellant argued the prohibition on any trade or business only encompassed businesses of a continuing nature. Id. In rejecting that argument, the Court of Special Appeals of

_____

[7] The covenants in Chesapeake Estates and Quinn Homes provided that the subject lots were to be used "for residential use only and not for purposes of any trade or business whatsoever." 288 A.2d at 330; 413 A.2d at 950. The Newell covenant, however, provides "[t]hat no factory, saloon, or business house of any kind shall be erected or maintained on the land hereby conveyed, but said land shall be occupied and used for residence purposes only and not otherwise." 131 A. at 149.

13

Maryland, relying upon Chesapeake Estates, held that the subject speculative home, built for the sole purpose of being sold to the public, violated the restrictive covenant prohibiting "any trade or business whatsoever" because the home was not built for residential purposes. Id.[8] This holding supports the notion that residential use is the primary objective of these similar restrictive covenants, but it fails to directly address the ambiguity of said covenants.

Nonetheless, for the foregoing reasons, the Court concludes the restrictive covenants are clear and unambiguous. Having found the restrictive covenants to be unambiguous, the Court now addresses the Plaintiffs' ability to enforce the restrictions under the doctrine of unclean hands.

## 2. The Doctrine of Unclean Hands

Notwithstanding the clear and unambiguous nature of the restrictive covenants, CBD argues Plaintiffs are precluded from enforcing the covenants due to their unclean hands. According to CBD, Plaintiffs have unclean hands for three reasons: (1) the Hollingsworths built their home without prior approval, in violation of paragraph h of the restrictive covenants; (2) Mr.

---

[8] In Lowden v. Bosley, however, the Court of Appeals of Maryland suggests, in dicta, that its restrictive covenant analysis concerning rental property would "be different or the [covenant] might be deemed ambiguous" if the restriction contained an express provision prohibiting any business or commercial use or benefit. 909 A.2d 261, 268 (Md. 2006).

Hollingsworth practices law in his home; and (3) the Hollingsworths grow crops on their property. The Court will address each argument in turn.

The purpose of the doctrine of unclean hands is "not to punish the wrongdoer, but to protect the courts from having to endorse or reward inequitable conduct." Roper v. Camuso, 829 A.2d 589, 609 (Md. 2003) (quoting WinMark Ltd. P'ship v. Miles & Stockbridge, 693 A.2d 824, 830 (Md. 1997)) (internal quotation marks omitted). Moreover, the doctrine requires "the alleged misconduct [to] be connected with the transaction upon which the claimant seeks relief." Adams v. Manown, 615 A.2d 611, 617 (Md. 1992). In other words, for the doctrine to apply, "what is material is not that the plaintiff's hands are dirty, but that he dirties them in acquiring the right he now asserts." Hicks v. Gilbert, 762 A.2d 986, 990 (Md.Ct.Spec.App. 2000) (alteration omitted) (quoting Adams, 615 A.2d at 617). The Court has sole discretion in applying the unclean hands doctrine. Space Aero Prods. Co. v. R.E. Darling Co., 208 A.2d 74, 88 (Md. 1965).

### a. Violation of Paragraph H

CBD first argues Plaintiffs are unable to enforce the covenants under the doctrine of unclean hands because they built their home without prior approval in violation of paragraph h. The Court concludes that this alleged violation does not render

Plaintiffs unable to enforce paragraph c of the restrictive covenants.

Paragraph h of the restrictive covenants provides, in relevant part, that "[n]o building or other structure shall be commenced, erected or maintained, . . . [without being] approved in writing by Frederick R. Menke, his successor or successors in interest, his nominee or nominees." (CBD's Mot. Summ. J. Ex. 3, at 3). While CBD may be correct regarding Plaintiffs' failure to obtain approval prior to building their home, (see CBD's Mot. Summ. J. Ex. 17, at 14-15, ECF No. 54-18), that alleged violation does not preclude Plaintiffs from enforcing the deed restrictions regarding the prohibition against the practice of "any trade or business whatsoever" on the land. As noted above, Plaintiffs must have dirtied their hands "in acquiring the right [they] now assert." Hicks, 762 A.2d at 990. Plaintiffs seek to enforce paragraph c of the restrictive covenants, which limits the land to residential use. Therefore, even if Plaintiffs' hands are dirtied from violations of paragraph h, it is not the restriction they now assert.[9]

_____

[9] The Court notes that Plaintiffs' Complaint seeks a declaration that CBD's construction of the proposed winery structure without obtaining prior approval pursuant to paragraph h constitutes a violation and breach of the restrictive covenants. (See, e.g., Compl. at 13). Plaintiffs now assert, however, that they are not seeking enforcement of paragraph h. (See Pls.' Resp. to CBD's Mot. for Summ. J. at 8). Given Plaintiffs' withdrawal of this claim, the Court will not address

Paragraph h aside, the question remains whether Mr. Hollingsworth's alleged practice of law in his home and the growing of crops on the Hollingsworth property precludes Plaintiffs from enforcing paragraph c of the restrictive covenants.

### b.   Mr. Hollingsworth's Law Practice

CBD argues Plaintiffs have unclean hands because Mr. Hollingsworth uses his home as a satellite office for the Hollingsworth Law Firm, LLC, from which he conducts business daily.  The Court concludes that Mr. Hollingsworth's use of a home office to complete tasks associated with his law practice is incidental to the use of his home as a residence because it does not contravene the restrictive covenants' purpose of maintaining a residential community.

The concept of incidental usage amidst a restrictive covenant that prohibits any activity other than residential use is best described in Osborne v. Talbot, 78 A.2d 205 (Md. 1951), and Grubb v. Guilford Association, Incorporated, 178 A.2d 886 (Md. 1962).  The restrictive covenant in Osborne stated, in pertinent part, "[t]hat no shop, store, factory, saloon or business house of any kind . . . shall be erected or maintained on the premises hereby conveyed, but the said premises shall be

---

whether Plaintiffs have unclean hands as it relates to paragraph h.

occupied and used for residence purposes only and not otherwise." 78 A.2d at 206. Similarly, the <u>Grubb</u> covenant provided that "the land shall be used for private residential purposes only and that no building of any kind, except private dwelling houses designed for occupation by a single family and private accessory garages shall be erected or maintained thereon, and that any waiver thereof must be in writing." 178 A.2d at 886-87. Both cases considered whether owners could maintain a home office notwithstanding the aforementioned covenants.[10] In <u>Osborne</u>, the Court of Appeals of Maryland noted that the lower court construed the restrictive covenant too narrowly by failing to distinguish between conducting an entire practice in the home and incidental usage. 78 A.2d at 207. The use of a home office is incidental when an individual regularly practices from a separate location (or main office) that has its own address and telephone number, the home office is used occasionally, and the home office is not held out to be an additional office location, among other things. <u>See, e.g.</u>, <u>id.</u> at 208-10; <u>Grubb</u>, 178 A.2d at 887. Incidental usage has been found to not be a violation of restrictive covenants limiting

---

[10] Although neither covenant includes the language prohibiting "any trade or business whatsoever," the pivotal inquiry is whether the proposed activity contravenes the drafter's intent of creating a residential community.

use to residential purposes only when such usage does not violate the residential objective of the covenant.

Plaintiffs concede that Mr. Hollingsworth occasionally uses a small office in the home to take phone calls, review/revise legal documents, and send e-mails. (See Pls.' First Supplemental Answers to Def.'s First Set of Interrogs. ["Pls.' First Supplemental Answers"] at 16-22, ECF No. 54-18; Joe Hollingsworth Dep. 69:2-71:12, June 12, 2013, ECF No. 54-13; Nancy Hollingsworth Dep. 31:13-32:8, June 13, 2013, ECF No. 54-14). Plaintiffs also contend, however, that Mr. Hollingsworth has never served clients at the home, Mr. Hollingsworth's law firm has a single office in Washington, D.C., and the home office is not held out to the public as an additional office location. (See Pls.' First Supplemental Answers at 18-19, 22-23; Joe Hollingsworth Dep. 68:2-7, 75:17-76:8). Mr. Hollingsworth's activity in his home office is incidental to his use of the property as a residence. Moreover, this activity falls short of the parties' activities in Osborne and Grubb who sought to have clients visit the home office on occasion.[11]

---

[11] The Osborne court also noted "[t]he suggestion has been made in judicial opinions that some kinds of personal business, such as that of a physician or a lawyer, may be carried on in one's dwelling house without inconvenience to the neighboring property holders and without changing the general private character of the use of the building." 78 A.2d at 210 (citing Smith v. Graham, 147 N.Y.S. 773 (N.Y.App.Div. 1914)).

Defendants have not provided any evidence disputing Plaintiffs' concessions beyond mere speculation that the distance between Mr. Hollingsworth's law firm and his home is too great to conclude that Mr. Hollingsworth does not use his home as a satellite office daily.[12]  (CBD's Resp. to Pls.' Mot. Summ. J. 14, ECF No. 58 ("How can he live and principally reside in Trappe and yet run the business of a law firm which has its only office in Washington, DC two hours drive away? . . . The obvious answer is that Mr. Hollingsworth uses the Hollingsworth Property regularly as a satellite home office from which he daily conducts business.") (emphasis in original). Notwithstanding this speculation, there is no indication that Mr. Hollingsworth's incidental use of his home office to work on legal matters violates the covenants' purpose of maintaining a

---

[12]  Furthermore, in refuting Plaintiffs' arguments, CBD contends that the "growing of grapes, the processing of wine and the storing of wine" are also incidental to the use of the CBD property as a residence. (CBD's Resp. Pls.' Mot. Summ. J. at 13).  According to CBD, its proposed use of the property is "benign" and it is neither using the property as wedding venue nor building a retail store.  (Id. at 14).  CBD's contentions, however, conflict with its request that the Court declare that the deed restrictions do not preclude it from operating a winery, storage facilities, a wine tasting room, and a retail farm market on the property.  (See CBD's Mot. Summ. J. at 47-52).  There are other documents in the record that suggest CBD planned to conduct more than the "benign" activity it now presents to the Court.  (See, e.g., Pls.' Mot. Summ. J. Ex. J (CBD's website pages inviting the public to wine tastings and opportunities to dock boats on its pier); id. Ex. M, at 5 (attachment to packet requesting a special exception to process grapes on-site and open a farm market complete with a tasting room as well as a retail sales  area)).

residential community.  Moreover, in this age of advanced technology, it is hard to imagine an attorney who does not use his or her electronic devices to complete work from home.  There is no indication that this activity either infringes upon the residential character of the neighborhood or is otherwise obtrusive in any way.  Mr. Hollingsworth's activity, therefore, does not prohibit the Plaintiffs from enforcing paragraph c of the restrictive covenants.

### c. Crop Growth on the Hollingsworth Property

CBD also argues Plaintiffs have unclean hands because they conduct agricultural activity on their property.  The Court concludes that Plaintiffs' growth of crops on the property does not render them guilty of unclean hands because it comports with the current usage of their neighbors.

It is undisputed that Plaintiffs grow crops on their land. (CBD's Mot. Summ. J. at 22; Pls.' Mot. Summ. J. at 20).  In 1972, the land that now encompasses Plaintiffs' and CBD's property was farmland.  At the time the Hollingsworths and Daly Trust acquired their land in 2004 and 2006 respectively, at least part of the land was used for agricultural activity, which included the growth of crops, such as corn and beans, on the property.  (See Jeffrey Menke Dep. 21:7-23:13, June 10, 2013; ECF No. 54-8).  It is, therefore, nonsensical to conclude that the restrictive covenant prohibiting the use of land for

"purposes of any trade or business whatsoever" restrains land owners from engaging in the same agricultural activity that has occurred during, and since, the drafting of the deed restrictions.

Even if the Court reaches such a conclusion, and therefore concludes that the restrictive covenant has been violated on several occasions, those violations do not preclude Plaintiffs from enforcing activity that exceeds the scope of the community's existing agricultural violations. See, e.g., Chevy Chase Vill. v. Jaggers, 275 A.2d 167, 172 (Md. 1971) (noting that any violation of the covenant that constitutes a waiver of its enforcement is limited to the scope of that waiver); Schlicht v. Wengert, 15 A.2d 911, 914 (Md. 1940) (finding the plaintiffs' prior endorsement for another to secure an alcohol license did not preclude them from enforcing a covenant prohibiting the operation of a saloon). CBD's proposed use of the land to process grapes on site and welcome visitors for tours/tastings exceeds the current activity of residents having farmers conduct agricultural activity on the land for use elsewhere. There is no indication in the record that on-site processing and public tours/sales occur in the residential community. Plaintiffs, therefore, are not precluded from enforcing the restrictive covenant against CBD's use of the

property to process grapes on site, store wine for public sales, and conduct public tours/sales on the property.

To the extent Plaintiffs try to limit CBD's agricultural activity to crops that have been "traditionally" grown on the parcels, however, that attempt fails. The Court is not persuaded that the growth of "traditional" crops on the land precludes subsequent homeowners from growing grapes or some other type of fruit or vegetable on their property. That construction is an improper, narrow restraint and unsupported by the law. The growth of any fruit or vegetable, therefore, will be permitted as long as it is performed in line with the current residential scheme.

Accordingly, the Court concludes that Plaintiffs are not guilty of unclean hands and, therefore, are not estopped from enforcing paragraph c of the restrictive covenants prohibiting the practice of any trade or business whatsoever on the property.

### 3. Abandonment

CBD also argues the restrictive covenants have been abandoned because the original plans for the development of a multi-lot subdivision of the Hollingsworth property never came to fruition. Furthermore, CBD argues the existence of the MET Easements on the subject properties, declaring the right to conduct commercial agricultural operations on the land, also

illustrates abandonment of the deed restrictions.  The Court concludes that both arguments fail.

In Maryland, a restrictive covenant is considered abandoned where "there has been a complete or radical change in the neighborhood causing the restrictions to outlive their usefulness." Jaggers, 275 A.2d at 171.  A neighborhood change is not considered complete or radical if deviations from the original plan are minimal.  Id.  Under this backdrop, the Court will address CBD's abandonment arguments.

### a. Multi-Lot Subdivision

CBD avers that the restrictive covenants are related to a development plan that intended to subdivide the Hollingsworth property into a multi-lot residential subdivision.  According to CBD, the multi-lot subdivision never came to fruition and, instead, the parcels remained farmland.  The Court will not consider this argument because CBD never raised the alleged sub-division plan as a factual basis for its abandonment argument during discovery and has, thus, waived the argument.

In its Answer to the Complaint, CBD avers "Plaintiffs' claims are barred in whole or in part because the alleged restrictions, covenants and agreements have been abandoned." (CBD's Answer ¶ 77, ECF No. 5).  Plaintiffs' First Set of Interrogatories directed CBD to "[e]xplain the factual basis for the affirmative and negative defenses [it] raised in the Answer

. . . and identify all documents and witnesses that support the same." (Pls.' Resp. to CBD's Mot. Summ. J. Ex. B, at 3, ECF No. 59-2). CBD refused to respond and instead declared the interrogatory overly broad, unduly burdensome, and subject to information protected by the attorney client and attorney work product privileges. (Id. at 3-4). Thereafter, CBD refused to supplement its answer to Interrogatory No. 2.[13] (Id. Ex. C, at 1). CBD cannot evade Plaintiffs on this issue throughout the course of discovery and then present it to the Court for the first time in its summary judgment motion. In fact, if this argument were the subject of a motion in limine at trial this theory of abandonment would be excluded for the same reason. As a result, the Court will not consider CBD's abandonment argument as it relates to the alleged multi-lot subdivision plans.[14]

### b. Effect of the MET Easements on the Restrictive Covenants

CBD also avers that the MET Easements on the subject lands are further indicia of abandonment because they permit the very

---

[13] The Court will not address Plaintiffs' argument regarding CBD's failure to raise the abandonment argument in response to Interrogatory No. 5 because that interrogatory calls into question Plaintiffs' actions, not that of the covenants' drafter.

[14] Even if the Court were to consider CBD's abandonment argument it would find that the alleged failure to create a multi-lot subdivision on the land does not contravene the drafter's intent to create a rural residential community. Moreover, there is no indication that farmland is outside of that objective.

activity Plaintiffs seek to enjoin. The Court concludes that the MET Easements do not control because the deed restrictions are more restrictive.

In 1981, the Dalys and Higgins encumbered portions of Plaintiffs' and CBD's properties into conservation easements with the Maryland Environmental Trust. (See CBD's Mot. Summ. J. Exs. 8-9). The purpose of the MET Easements is, inter alia, to preserve the scenic, agricultural, and rural nature of the land. Moreover, the easements provide, in relevant part:

> No industrial or commercial activities, with the exception of farming and activities that can be conducted from a residential or farm building without alteration of the external appearance of the building, shall be conducted on the Property. Sale of farm products by the Grantor to the public shall be a permitted use.

(CBD's Mot. Summ. J. Ex. 8, at 5; id. Ex. 9, at 4). Although the easements are deemed perpetual, the Court notes the Hollingsworths purchased their property specifically subject to the MET Easement (see CBD's Mot. Summ. J. Ex. 2, ECF No. 54-3), but CBD did not (see id. Ex. 1, ECF No. 54-2).

Section 2-118 of the Real Property article of the Maryland Code governs conservations easements. See Md. Code Ann., Real Prop. § 2-118 (West 2013). The MET Easements at issue in this case are considered easements in gross and "may be extinguished or released, in whole or in part, in the same manner as other easements." Id. § 2-118(c)-(d).

26

The Court is unaware of any Maryland cases addressing the issue presently before it. Namely, the effect of a later-established conservation easement on a prior-established restrictive covenant that prohibits some of the activity permitted in the easement. Although there is not a case completely on point, there are cases involving the interplay between restrictive covenants and later-established governmental regulations, such as zoning ordinances. In those situations, the Maryland courts have consistently held that the most restrictive document controls. See, e.g., City of Bowie v. MIE Props., Inc., 922 A.2d 509, 532 (Md. 2007) ("Covenants would be pointless if they could not restrict the uses of a property to a greater degree than permitted by the underlying zoning of property. As along as the covenant is as or more restrictive, and not less restrictive . . . the goals of zoning are not frustrated."); Colandrea v. Wilde Lake Cmty. Ass'n, Inc., 761 A.2d 899, 902 n.2 (Md. 2000) ("Generally, when property is subject to both zoning and other governmental regulations, and conditions created by real property covenants, that property must satisfy the most restrictive of the regulations or conditions."); Sea Watch Stores LLC v. Council of Unit Owners of Sea Watch Condo., 691 A.2d 750, 768 (Md.Ct.Spec.App. 1997) ("[W]e hold that when a condominium is also subject to the provisions of governmental regulations, i.e., zoning, etc., as

between the deed restrictions . . . the most restrictive apply."). The same premise applies here.

CBD avers that the MET Easements signify an abandonment of the previously instituted restrictive covenants because it indicates that the parties' predecessors, such as Hugh Daly, would not have entered into the MET Easements if they believed commercial agriculture, including the on-site processing and sale of agricultural products, were prohibited. As an initial matter, the Court has already acknowledged that agricultural activity has always been germane to the parcels in question. Moreover, CBD's averment regarding the intent of those that entered into the MET Easements is speculative and not supported by the record.

Although the MET Easements permit on-site processing and the sale of farm goods on the land, there is no indication that the current homeowners in the community engage in that activity. As previously noted, the current landscape is that of a rural residential community that engages in minimal agricultural activity. This is the extent of the permitted commercial activity. As a result, the restrictive covenants prohibiting CBD from engaging in activity that exceeds the current activity in the community surmount the MET Easements permitting the opposite.

### 4. The Road Maintenance Agreement

Finally, CBD argues the Road Maintenance Agreement permits it to upgrade the surface of Riverside Lane, including widening and paving the road, at its own expense. The Court concludes that the plain language of the Road Maintenance Agreement requires CBD to obtain unanimous consent to upgrade Riverside Lane.

Riverside Lane is a private roadway that services each of the subject properties in this matter. In January 2004, the Mitchells, Dalys, and Octoraro Holdings, LLC entered into a Road Maintenance Agreement ("RMA") regarding the common usage of Riverside Lane. (See CBD's Mot. Summ. J. Ex. 19, ECF No. 54-20). Similar to the deed restrictions, the RMA will be construed under ordinary contract principles whereby its language will be given its plain and ordinary meaning if deemed unambiguous.

The RMA provides, in relevant part, that "[t]he property owners agree to maintain Riverside [Lane] in its present condition as a crowned, gravel lane, approximately twelve (12) foot [sic] in width, with a top chipping of crushed stone." (Id. at 2). Moreover, substantial changes to Riverside Lane "such as upgrading, widening, or converting [it] from a private road to a public road" requires "unanimous consent." (Id.). The RMA also provides that the owner who wishes to upgrade the

29

surface of Riverside Lane _only_ "may do so at their sole cost and expense, including assuming the additional cost and expense of maintaining the roadbed in that condition." (Id.).

The plain, unambiguous, language of the RMA prohibits CBD from widening and paving Riverside Lane without unanimous consent, regardless of whether it plans to do so at its own expense. Under the RMA, substantial changes to Riverside Lane require CBD to obtain unanimous consent from Plaintiffs. The provision of the RMA permitting CBD to absorb the costs of upgrading the lane only applies to upgrading the road surface. This provision, however, does not permit CBD to conduct substantial changes to Riverside Lane, such as widening the lane or permitting public usage, without unanimous consent. This litigation makes it abundantly clear that Plaintiffs do not consent to CBD's proposed changes.

As a result, the Court concludes that the RMA precludes CBD from conducting its planned upgrades to Riverside Lane without unanimous consent.

### III. CONCLUSION

For the foregoing reasons, the Court will, by separate order, GRANT Plaintiffs' Motion for Summary Judgment (ECF No. 55) and DENY CBD's Motion for Summary Judgment (ECF No. 54). Judgment will be entered in favor of Plaintiffs against CBD.

Specifically, CBD may grow and harvest grapes but may not process them into wine on the property.

The balance of CBD's plans, including on-site wine processing/storage, tours/tastings, and retail sales market, are prohibited.   Only the agricultural activity of growing and harvesting grapes, as well as vine and trestle maintenance, or like activities, are permitted.


Entered this 12th day of December, 2013


                              _____/s/_____
                              George L. Russell, III
                              United States District Judge